UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
    UNITED STATES OF AMERICA,

              - against –              **MEMORANDUM OF DECISION**

    JOSE AGUILAR LANDAVERDE,         10-cr-531 (BMC)

              Defendant.
---------------------------------------------------------- X

**COGAN**, District Judge.

Defendant faces charges for Hobbs Act robbery conspiracy, Hobbs Act narcotics distribution conspiracy, and unlawful use of firearms in furtherance of both. Defendant had moved to suppress evidence gathered in connection with a November 2007 car stop. I held an evidentiary hearing and subsequently denied the motion from the bench. This opinion explains the grounds for that ruling.

## FINDINGS OF FACT

On November 15, 2007, Corporal Donnie Carter of the Sampson County Sheriff's Office observed defendant driving a vehicle that he believed violated the window tint laws. Prior to pulling defendant over for that infraction, Corporal Carter observed both defendant and his passenger change positions from relaxed to rigid upon them passing the marked police car. Specifically, he saw that defendant had gone from a relaxed posture to a stiff posture and that he sat up straighter, fixing his hands at the proper "ten-and-two" position. He also observed the passenger slide into a crouched position, pressing himself into the seat as if to hide his body from the officer's sight.

Once Corporal Carter had pulled the vehicle over to the side of the road and exited his patrol car, he approached the passenger's side of the vehicle and identified himself. Defendant thereafter handed Corporal Carter a North Carolina driver's license in the name of "Rolando Ruiz" and presented the vehicle registration, which showed that the car he was driving belonged to his passenger, Rigoberto Rivera. Corporal Carter immediately noticed that the car contained an "overwhelming" odor of air fresheners, which he knew from his experience could be used to mask the scent of narcotics.

After asking defendant to step out from the driver's seat of the car, Corporal Carter performed a consent search on defendant's person, finding a necklace in his pocket. He then requested that defendant sit in the patrol car with him while he ran defendant's driver's license and the vehicle registration. While together in the patrol car, Corporal Carter asked defendant where he was coming from, to which defendant responded that he and Rivera had been in Raleigh to visit a friend. When Corporal Carter inquired about the friend, defendant could not recall his name, but said he knew him only by his nickname.

Corporal Carter then asked about the passenger's (Rivera's) name. Defendant hesitated for a few moments before answering. Defendant further stated that he worked in a restaurant in Clinton, North Carolina. During the entire discussion, Corporal Carter observed that defendant appeared stiff and rigid, and was looking straight ahead instead of looking at Corporal Carter.

Corporal Scott Grantham, also of the Sampson County Sheriff's Office, arrived on the scene while Corporal Carter was still sitting with defendant in the patrol car. Corporal Grantham went up to Rivera and asked from where he had driven. Rivera replied that he and defendant were roofers who had been in Raleigh all day, but were not able to work because of the rain. When Corporals Carter and Grantham then compared their respective discussions in defendant's

presence, defendant appeared to become flustered when his story didn't match up with Rivera's, and interjected that Rivera does not speak English.

At that point, Corporal Carter issued defendant a warning ticket for the window tint. He then approached Rivera's side of the vehicle, asking him to step out. After receiving consent, Corporal Carter performed a search of Rivera's person, finding jewelry in his pockets as well as flex handcuffs and approximately $3,100 in cash. Corporal Carter recognized that these items also were indicia of criminal activity. Specifically, the fact that both defendant and Rivera had jewelry in their pockets was a sign that they had recently been involved in activity consistent with a robbery.

Corporal Grantham then retrieved his certified narcotics detection dog, K-9 Beny, in order to conduct a free-air search of the vehicle. At the time of the stop, Corporal Grantham and Beny had been a certified narcotic detection team for approximately one year, after completing the required 238 hours of training. Beny was certified by the North American Police Work Dog Association in November 2006 and was re-certified in September 2007 (never failing any of his certification tests). Pursuant to these certifications, Beny was qualified to detect cocaine, heroin, marijuana, and methamphetamine. During field training, Beny was rewarded both when he alerted in the presence of narcotics and when he did not alert in situations where narcotics were absent. In short, Beny was not primed or encouraged only to find narcotics, but to get the answer correct.

Corporal Grantham and Beny circled the car twice in a counterclockwise direction. At various points, Corporal Grantham "presented" the seams of the car for Beny to sniff. During the first revolution, Beny stopped at the front passenger door seam, showing interest and possibly alerting. However, Corporal Grantham noticed that there was an object on the ground outside

3

that door, and he could not be sure that Beny was not distracted by the object. The pair continued in this manner around the car without incident or alert until they reached the trunk. When Corporal Grantham then moved his hand to the seam of the trunk to present that area, Beny jumped with his front paws upon the vehicle. Corporal Grantham moved on without any apparent recognition of an alert.

During the second revolution, Beny again appeared to show interest in the front passenger door upon Corporal Grantham presenting the seam. According to Corporal Grantham, he observed Beny change his posture and breathing, and begin to scratch the door seam, which, consistent with his typical bark/bite/scratch mode of alert, signaled to Corporal Grantham that Beny was giving a positive alert. Taking that as a cue, Corporal Grantham opened the door and allowed Beny to search the vehicle. Soon after, Beny scratched and barked at a duffel bag in the back seat of the vehicle. Corporal Grantham then extracted the bag from the vehicle, at which point Rivera took off running. After catching up to and apprehending Rivera, the officers placed him under arrest and returned to the duffel bag.

Upon opening the bag, the officers found several large bundles of U.S. currency. They also found additional bundles of U.S. currency underneath the driver's seat of the vehicle, wrapped in a similar manner to the money in the bag. Altogether, the officers recovered approximately $140,000.

Defendant moved to suppress the contents of the search for lack of probable cause.

### CONCLUSIONS OF LAW

"[P]olice may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." See United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004). Probable cause to search a vehicle, however,

4

must be independently established from the reasons for the traffic stop. See Rodriguez v. United States, 575 U.S. 348, 354 (2015) (comparing the procedure and requirements of a traffic stop and subsequent vehicle search to those of a Terry stop and subsequent frisk of a person).

"Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004). Factors such as furtive or suspicious behavior, inconsistent answers to law enforcement's questions, or suspicious smells and sounds can form the basis for probable cause. See United States v. Jackson, 652 F.2d 244, 251-52, 251 n.6 (2d Cir. 1981); United States v. Vasquez, 638 F.2d 507, 526 (2d Cir. 1980).

In addition, the Supreme Court in Florida v. Harris, 568 U.S. 237, 246-47 (2013), held that

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

Here, there is strong evidence that probable cause existed even prior to K-9 Beny's free-air sniff. Indeed, once Corporal Carter pulled defendant over for the tinted windows,[1] his observations of defendant and Rivera provided an unending stream of cause for the eventual search of Rivera's vehicle. I draw this conclusion not only upon the credible testimony of Corporals Carter and

---

[1] And even prior to the stop, Corporal Carter noticed that the vehicle's occupants appeared nervous at the sight of the police car.

5

Grantham, but also based on my review of the dash camera video footage of the events described above.

Corporal Carter noticed on several separate occasions that both defendant and Rivera were carrying themselves in a suspicious way. Their posture stiffened in his presence; defendant avoided eye contact; and defendant hesitated before answering certain questions. Nor could defendant recall the name of his friend who he had just spent time with earlier that day. Corporal Carter also immediately perceived the strong odor of air fresheners in the car, which he knew from experience could be used to mask the scent of narcotics.

Suspicion only increased when Corporal Carter noticed that both defendant and Rivera had jewelry tucked in their pockets, which he recognized as a sign of a person expecting future physical altercation. And upon searching Rivera, he found a pair of flex handcuffs and a large amount of cash – two further, rather obvious indicia of criminal activity. Perhaps just as telling were the stark differences between what defendant told Corporal Carter and what Rivera told Corporal Grantham. For example, one said that they were in Raleigh to visit a friend, the other to perform a roofing job. Corporal Carter testified that he suspected that defendant was involved in criminal activity even at this point. I agree, and find that probable cause existed once Rivera had been searched. See Jackson, 652 F.2d at 251-52, 251 n.6; Vasquez, 638 F.2d at 526

K-9 Beny's free-air sniff only adds to this already-sufficient quantum of probable cause – and, moreover, was likely independently sufficient to search the vehicle. Corporal Grantham and Beny were a narcotic detection team with multiple certifications, significant training, and reliable field experience. Nothing at the hearing called these bona fides into question. This alone renders an alert from Beny probable cause to search the car. See Harris, 568 U.S. at 246-47.

6

Furthermore, Corporal Grantham handled the sniff search with special care, as he disregarded an otherwise objective alert upon observing something on the ground that he thought *could have* distracted Beny at the time. The rest of the search was relatively unremarkable aside from Beny's sniff of the trunk seam. Although it was admittedly difficult to tell from the dash camera video what, exactly, made Corporal Grantham recognize Beny's eventual alert, the fact remains that Corporal Grantham did so recognize the alert and was the most qualified person to do so. In fact, he testified at some length about what he observed in Beny's behavior that indicated an alert – things such as his breathing, posture, and scratching. And if there was any doubt about whether probable cause existed to search the contents of the duffel bag itself after Beny's clear alert, that went out the window once Rivera fled at the sight of it.

Defendant argues that prior to K-9 Beny's free air sniff, the officers had, at most, reasonable suspicion sufficient to extend the vehicle stop. Under that assumption, he further argues that Beny did not issue a reliable alert and so the resulting vehicle search was unlawful. I disagree on both counts.

Defendant's main contention in claiming a lack of probable cause prior to the sniff search is that the "factors identified by Corporals Carter and Grantham" are substantially similar to those in United States v. Santillan, 902 F.3d 49 (2d Cir. 2018), which merely found a "not overwhelming" showing of reasonable suspicion. He also points out that the Government itself analogized this case to Santillan in a previous brief – though the Government has since clarified that it used that case to show *a fortiori* that reasonable suspicion existed in order to extend the stop.

I agree with the Government that "Corporal Carter and Corporal Grantham observed multiple indicators of criminal activity that gave rise to probable cause to search the Honda even

7

before Beny gave a positive alert to the odor of narcotics." Indeed, the factors considered by the Court in <u>Santillan</u> were limited to the car occupants' "nervous behavior, illustrated by their avoidance of eye contact with [the officer] and visibly shaking hands, coupled with their inability to provide a clear answer as to where they had come from." <u>Id.</u> at 57. In this case, we have these things and much more, including the strong odor of air fresheners in the car, the flex handcuffs and extraordinary amount of cash (over $3,100) on Rivera's person, and the fact that both defendant and Rivera had their religious jewelry in their pockets. These additional factors are objective indicia of robbery activity.

Moreover, an important factor in considering whether probable cause existed at the time of a search is the real-time, reasonable inferences that an officer can make based on the facts and circumstances before him. See <u>United States v. Singletary</u>, 798 F.3d 55, 60 (2d Cir. 2015) ("[A] court must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, *whose insights are necessarily guided by his experience and training*." (emphasis added)). As previously mentioned, I found credible Corporal Carter's testimony that he recognized the combination of factors present at the scene to be a strong indication of criminal activity. Specifically, Corporal Carter testified that

> Because [Rivera] and [defendant] both had their jewelry in their pocket, along with the flex cuffs and the fact that [Rivera] had a large amount of money on his person, I had already formed the opinion at that point that they probably were involved in some sort of robbery.

When asked why the location of the jewelry indicated their involvement in a robbery, Corporal Carter responded that he believed defendant and Rivera "took it off of their person and put it in their pocket to prevent it from getting ripped . . . from their body." Based on these representations and the objective signs of criminal activity present at the stop, there was probable cause to search the vehicle prior to any canine involvement.

8

And speaking of canines, defendant argues that Beny "did not reliably alert to the presence of narcotics in the [v]ehicle." He also suggests that Corporal Grantham's testimony that he was the "only one who could say that [Beny] alerts or not" should preclude the Court from relying upon his recognition of one here. Although this second contention raises an interesting point in a vacuum, I have not *just* taken Corporal Grantham at his subjective word that he perceived Beny's alert. Rather, I took his opinion as Beny's handler and training partner to be confirmation that Beny's observable, alert-like behavior– scratching at the door, standing perpendicular to the vehicle, and stiffened posture – actually indicated that Beny was alerting. To be sure, recognition of an alert, like any other "facts that could justify the issuance of a warrant," should be based on objective criteria. See United States v. Ross, 456 U.S. 798, 808 (1982). But a court can certainly consider an officer's "experience and training" with a particular dog in weighing his understanding of that dog's behavior. See Singletary, 798 F.3d at 60. Here, I find that Beny exhibited the objective signs of an alert at the front passenger door, which conclusion is supported by Corporal Grantham's confirmation of the same.

## CONCLUSION

Defendant's [376] motion to suppress is denied.

**SO ORDERED.**

_____  
U.S.D.J.

Dated: Brooklyn, New York  
      January 8, 2020